Filed 12/30/15  Kelley v. Merle Norman Cosmetics CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STEPHANIE KELLEY, | B251445 |
| Plaintiff and Appellant | (Los Angeles County Super. Ct. No. BC454430) |
| v. | |
| MERLE NORMAN COSMETICS, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Frederick C. Shaller, Judge.  Affirmed with directions.

Teren Law Group, Pamela McKibbin Teren, for Plaintiff and Appellant.

Horvitz & Levy, Barry R. Levy and Daniel J. Gonzalez; Ballard Rosenberg Golper & Savitt, Richard S. Rosenberg, Linda Miller Savitt, and Elsa Bañuelos, for Defendants and Respondents.

\* \* \*

A jury found that plaintiff Stephanie Kelley (plaintiff) had not been sexually harassed while working for defendant Merle Norman Cosmetics, Inc. (Merle Norman), but that Merle Norman had retaliated against her for exercising her right to report sexual harassment. The jury awarded her just over $1 million in damages. Due to an error in the jury instructions on the retaliation claim and to discovery misconduct by plaintiff that came to light midtrial, the trial court granted a new trial on *all* of plaintiff's claims. The court also assessed $40,113 in sanctions on plaintiff because of that discovery misconduct. Plaintiff appeals, arguing that the trial court should not have granted a new trial on the retaliation claims, that she is entitled to a retrial of the harassment-related claims due to errors in the trial, and that the sanctions award is improper. Merle Norman cross-appeals, contending that the trial court erred in not granting judgment notwithstanding the verdict on the retaliation claims and in granting a new trial on all of plaintiffs claims rather than just the retaliation-based claims, and also seeking review of certain evidentiary rulings relevant to any retrial. We conclude that the trial court committed no reversible error and affirm, but remand to give Merle Norman the opportunity to elect whether to withdraw its new trial motion.

## FACTS AND PROCEDURAL HISTORY

### I. Facts

#### A. *Facts undisputed at trial*

Merle Norman develops cosmetics and skincare products and sells them at retail studios throughout the country. Defendant Jack Nethercutt (Jack) is the company's chairman and his wife, defendant Helen Nethercutt (Helen), is its vice chairman.[1] Plaintiff served as the company's director of marketing from September 2007 until she was fired in November 2010.

In early 2009, Helen told one of plaintiff's subordinates, Sarah Tillman (Tillman), that she should wear a different type of brassiere. Plaintiff reported Helen's comment to

---

[1]     Because the Nethercutts share the same last name, we use their first names for sake of clarity. We mean no disrespect.

Merle Norman's director of human resources in June 2009, and he relayed the report to the Jack and Helen (collectively, the Nethercutts) in September 2009.

In October 2009, Merle Norman moved its marketing department to a different suite of offices. In February 2010, Merle Norman created and filled a new chief operating officer position to oversee, among other things, the marketing department.

On April 6, 2010, plaintiff sent a two-page email to the Nethercutts and to representatives of the California Department of Fair Employment and Housing and the California Employment Development Department. In the email, plaintiff stated that Merle Norman had hired the new chief operating officer to "scrutinize [her] performance"; that this "over-scrutiny" was in "retaliation for [her] role in" reporting the sexual harassment against Tillman and others; and that "Merle Norman (Jack and Helen Nethercutt) have been implicated in several sexual harassment and hostile work environment complaints which in [plaintiff's] opinion shows pervasive behavior." Plaintiff requested that the state agencies "open up an investigation against Merle Norman Cosmetics for sexual harassment and hostile work environment."

The next day, Helen spoke at a companywide meeting and, looking upset, told the group, "[A]ll it takes is one sourpuss employee, and that's what we have here." Approximately a week later, plaintiff went to the director of human resources and offered to resign in exchange for a severance package; he declined her offer. A week after that, on April 23, 2010, Robert Baker (Baker), sent plaintiff a letter on behalf of Merle Norman; in that letter, Baker relayed that Jack and Helen were "offended" by the "absolutely untrue statement" that they had been "implicated in several sexual harassment and hostile work environment complaints," and "request[ed] and demand[ed] . . . that [she] immediately send a retraction to all of the addressees" of her April 6, 2010 email. Failure to do so, the letter warned, "will result in [Merle Norman], as well as Jack and Helen Nethercutt, pursuing all legal remedies they have available to them against yourself." No one sued plaintiff.

Approximately one month later, on May 20, 2010, plaintiff went on medical leave. When she sought a further extension of her leave in June 2010, Merle Norman asked her

to submit to a medical examination by a doctor they chose, as provided for under Government Code section 12945.2, subdivision (k). Plaintiff never submitted to this examination. Merle Norman also hired someone to watch plaintiff to determine the legitimacy of her medical leave, although plaintiff did not know about the surveillance at the time.

By early November 2010, plaintiff had retained a lawyer. On November 13, 2010, the lawyer wrote a letter to Michael McGuinness (McGuinness), Merle Norman's lawyer, indicating that plaintiff wished to return to work on November 15 and requesting a copy of plaintiff's job description, a written statement of her job goals and objectives, a confirmation of her job title, duties, compensation and benefits, and a written confirmation that plaintiff would not be subjected to retaliation due to her past complaints of harassment. McGuinness responded the next day, relaying that Merle Norman was anxious to "provide [plaintiff] with an environment where she can thrive"; "assur[ing] [plaintiff's counsel] that Merle Norman will not retaliate against [plaintiff]" and "does not tolerate any such retaliatory behavior"; declaring the request for written documentation "[un]reasonable under the circumstances" and suggesting instead that plaintiff and the chief operating officer meet to discuss those matters after plaintiff returns to work; and proposing a return date of November 30. In an email sent on November 17, plaintiff's lawyer reiterated her request for the written documentation or for an explanation "why this cannot be provided promptly"; warned that treating plaintiff differently from other employees in terms of holiday vacation time or working long hours would be "evidence of illegal retaliation"; and suggesting a return date of November 22. The same day, and without waiting for a further response, plaintiff filed sexual harassment complaints against Merle Norman and Jack with the Department of Fair Employment and Housing. On November 18, McGuinness wrote that plaintiff's "conditions on her return to work" were unacceptable, and that Merle Norman "considers [plaintiff's] employment . . . to be terminated."

At the time of her termination, plaintiff still had on her personal computer Merle Norman's entire H:/ drive—that is, more than 17,000 pages of proprietary Merle Norman documents.

### B.    *Plaintiff's additional facts*

Prior to reporting Helen's comments regarding Tillman's bra selection, Jack and Helen had praised plaintiff for her work.  In actuality, Helen had instructed plaintiff to tell Tillman to stop wearing sports bras and to wear clothing that better displayed her breasts, and had informed Tillman directly to wear clothing that placed her breasts "up front and center."  Jack thereafter told plaintiff that he agreed with Helen's advice, and that Tillman should be proud of being "well endowed because they all head south at some point."

Plaintiff had witnessed or heard about other sexually-laced comments or conduct involving Jack, Helen or other Merle Norman employees:  Helen once told plaintiff, in the midst of plaintiff's divorce, that she should "get a vibrator or . . . get laid"; Jack told plaintiff that she had a "hard body" and, at a meeting regarding names for lipstick colors, suggested "Pop Your Cherry"; Helen once said that a man's height was irrelevant because "everyone is the same size when they lay down"; Jack told a female employee complaining of an earache that her husband must have "found the wrong hole"; Jack told Tillman that she had not probably not watched any boxing matches while on her honeymoon because she "had [her] head down the whole time"; Jack referred to Merle Norman's female vice president of education as a "hussy" and told her, when she placed her hand on him during a group photo, "If you put your hand there, you can do anything that you want to with [him]"; and Merle Norman's female corporate legal counsel "leer[ed]" at plaintiff and other female.

After Jack and Helen learned of plaintiff's complaint to the director of human resources, plaintiff and her staff were moved to "less desirable" offices; plaintiff's workload increased; and Jack and Helen hired a chief operating officer to become plaintiff's new boss. Plaintiff was also told that Tillman needed to improve sales for the products she oversaw, and that Tillman's job was "on the line."  Further, Helen made her

comment about a "sourpuss" employee while looking at plaintiff. Although Helen in this time frame told plaintiff she was "doing a good job," plaintiff felt that her compliment was "shallow."

## C. *Defendants' additional facts*

In response to the "great recession" of 2008, Merle Norman laid off several employees and instituted a wage freeze. Seeing this, plaintiff had been looking either to move up within, or to move on from, Merle Norman: In 2008 and early 2009, plaintiff twice asked Jack to promote her to vice president and was twice denied; she was concerned that the creation of a chief operating officer position above her on Merle Norman's organizational chart further reduced her chances of becoming a vice president; and she thereafter gave her resume to job recruiters and headhunters to help her find employment elsewhere. Jack and Helen were also concerned about plaintiff's job performance because plaintiff solicited feedback on skincare samples, but did not do so anonymously (as she had been instructed to do); and because plaintiff had mistakenly listed several products as "discontinued" in its customer catalogue, potentially resulting in sales losses exceeding $1 million.

Helen's comments regarding and to Tillman were, in actuality, "motherly advice" about how to dress in the workplace. Defendants' allegedly retaliatory acts had nothing to do with plaintiff's reporting Helen's comment to human resources: Plaintiff ended up with a larger office after the office move; plaintiff's workload increased because Tillman resigned and despite Merle Norman's efforts to ameliorate that shortfall by hiring a temporary employee; and Tillman's sales had, in fact, dropped.

Plaintiff nevertheless cited harassment as the reason why she offered to leave Merle Norman voluntarily in exchange for a severance package. When that offer was rejected, plaintiff declined the new chief operator officer's proposal to act as the liaison between plaintiff and the Nethercutts and instead sent the April 6, 2010 email, telling her secretary that she anticipated getting fired for sending it.

## II.    Procedural History

### A.    *Operative complaint*

In the operative First Amended Complaint (FAC), plaintiff alleged the following causes of action:  (1) sexual harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.) (against Merle Norman, Jack, and Helen); (2) retaliation under FEHA (against Merle Norman); (3) failure to prevent discrimination, harassment and retaliation under FEHA (against Merle Norman); (4) intentional infliction of emotional distress (against Merle Norman, Jack, and Helen); (5) wrongful termination in violation of public policy (against Merle Norman); and (6) retaliation for disclosing information to a public agency in violation of Labor Code section 1102.5 (against Merle Norman).  She sought compensatory and punitive damages.

### B.    *Jury verdicts*

Following a five-week trial, the jury returned three special verdict forms—one for each defendant.  The jury found that Jack had not engaged in harassing conduct.  The jury further found that Helen had engaged in harassing conduct, but that it was not severe or pervasive.  By a vote of 9 to 3, the jury also rejected the harassment and intentional infliction of emotional distress claims against Merle Norman.  By mostly unanimous votes, the jury found Merle Norman liable for retaliation, for failing to prevent retaliation, and for retaliating against plaintiff in violation of Labor Code section 1102.5.  The jury rejected Merle Norman's defenses that it had independent reasons to terminate plaintiff due to her insistence upon conditions prior to returning to work and her retention of company documents.  By a vote of 9 to 3, the jury awarded plaintiff a total of $1,055,236—$293,410 in past economic losses, $401,826 in future economic losses, and $360,000 for past noneconomic losses.  By a vote of 10 to 2, the jury found that Merle Norman had not acted with "malice, oppression or fraud" that warranted punitive damages.

### C.    *Post-trial motions*

As to the retaliation-based claims, Merle Norman moved for judgment notwithstanding the verdict (JNOV) and for a new trial on eight different grounds.  The

trial court issued a detailed 12-page order. The court denied the JNOV motion, but granted a new trial on two grounds—namely, that the jury instruction defining retaliation was incorrect in light of *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 and that the midtrial disclosure of the fact that plaintiff had retained thousands of Merle Norman's proprietary documents hamstrung Merle Norman's ability to present evidence supporting its defense that plaintiff orchestrated her own departure. The court rejected Merle Norman's other grounds for new trial. The court did not limit the new trial to the retaliation-based claims, and instead ordered a new trial as to *all* of plaintiff's claims.

Merle Norman also moved for $136,530.46 in attorney's fees and costs, and an additional $39,100 in attorney's fees and costs incurred by Baker, arising from having to respond to plaintiff's midtrial disclosure of her retention of proprietary documents. The trial court found that plaintiff had willfully not complied with Merle Norman's discovery request, and ordered her to pay sanctions totaling $40,113.

### D.     *Notices of appeal*

Plaintiff filed a notice of appeal. So did Merle Norman.

## DISCUSSION

## I.     Harassment Verdict For Merle Norman

Plaintiff raises four categories of trial court errors that, in her view, necessitate a retrial on her sexual harassment claim.

### A.     *Jury instruction errors*

We review de novo plaintiff's claims of instructional error. (*S.M. v. Los Angeles Unified School Dist.* (2015) 240 Cal.App.4th 543, 555 (*S.M.*).)

#### 1.     Instruction defining "harassment conduct"

FEHA makes it "unlawful . . . to harass an employee" "because of . . . [her] sex." (Gov. Code, § 12940, subd. (j)(1).) Sexual harassment claims typically take one of two forms: (1) quid pro quo harassment, "where submission to sexual conduct is made a condition of concrete employment benefits"; and (2) hostile work environment. (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1146.) To prove sexual harassment based on a hostile work environment, a plaintiff must prove "she was subjected to sexual

8

advances, conduct, or comments that were (1) unwelcome [citation]; (2) because of sex [citation]; and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment [citation]." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 (*Lyle*); *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1235-1236.) Harassment is "because of sex" as long as "'"gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.'" [Citation.].'" (*Lyle*, at p. 280.) In other words, the plaintiff need not show she was subjected to sexual advances. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 461-462; *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 1001; *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 346 (*Accardi*).) Although "'"[c]ommonly necessary personnel management actions . . . do not [usually] come within the meaning of harassment"'" (*Roby v. McKesson* (2009) 47 Cal.4th 686, 707, quoting *Reno v. Baird* (1998) 18 Cal.4th 640, 646-647 (*Roby*)), "harassment is generally concerned with the *message* conveyed to an employee" (*Roby*, at pp. 708-709). As a result, "official employment actions" that "have a secondary effect of communicating a hostile message" can form the basis of a hostile work environment claim. (*Ibid.*; see also *Accardi*, at p. 346.)

In light of this precedent, plaintiff argues that the trial court's initial rulings on the jury instructions and its response to a jury note were error. The trial court declined to give plaintiff's special instructions 2, 3, and 4.[2] Those instructions track the legal

---

[2]     In full, the proposed instructions read:
Special instruction 2: "A sexual harassment claim based on an alleged hostile work environment does not have to be based on sexual advances, sexual comments or conduct with overtly sexual overtones. Hostile environment sexual harassment shows itself in the form of intimidation and hostility for the purpose of interfering with an individual's work performance so long as gender is a substantial factor in the alleged conduct such that the conduct would not occur but for the gender of the complaining employee."
Special instruction 3: "Conduct that is not overtly sexual but hostile and/or apparently retaliatory for an employee's complaints about the accused harasser's alleged

9

principles set forth above, and special instruction 4 specifically states that "[o]fficial employment actions, such as discipline or termination, may be evidence of sexual harassment . . . if . . . [¶] motivated by a desire to communicate a hostile message." Instead, the trial court used a modified version of Judicial Council of California Civil Jury Instruction (CACI) No. 2523. The standard CACI No. 2523 instruction defines "[h]arassing conduct" to include four categories of conduct (namely, "[v]erbal harassment," "[p]hysical harassment," "[v]isual harassment," or "[u]nwanted sexual advances") set forth in FEHA regulations. (See Cal. Code Regs., tit. 2, § 11019.) The court added a fifth type of "[h]arassing conduct" to its instruction—"[h]ostile conduct or communications that convey an offensive message based upon gender."

Plaintiff asserts that this additional language did not allow the jury to consider, as "harassing conduct," all of the nonsexual personnel actions taken by Merle Norman, such as the office move, the creation of an additional layer of organizational hierarchy, and its request for a second medical opinion. We disagree. On its face, the instruction covers *any* "[h]ostile conduct or communications that convey an offensive message based on gender"; this is precisely what the above-cited cases contemplate. (*Roby*, *supra*, 47 Cal.4th at pp. 708-709; see also *Accardi*, *supra*, 17 Cal.App.4th at p. 346.) Plaintiff certainly thought the instruction reached personnel actions because she argued as much to the jury. Plaintiff counters that Merle Norman's closing argument was to the contrary, but its argument emphasized that any harassment must be "because *of sex*"; it said

---

sexually harassing conduct is 'sexually harassing conduct' if the conduct is sufficiently related to and/or grew out of prior alleged sexual harassment."

Special instruction 4: "Official employment actions, such as discipline or termination, may be evidence of sexual harassment if you find that [the defendants]: [¶](1) participated in an employment action or actions against [plaintiff] that was/were motivated by a desire to communicate a hostile message to [plaintiff] and contributed [to] making [plaintiff's] working environment . . . hostile; or [¶] (2) participated in an employment action or actions against [plaintiff] that were motivated by a personal desire to intimidate OR upset OR offend [plaintiff] or to communicate a hostile message to [plaintiff]; and (3) the employment action or actions were related to OR grew out of [plaintiff's] report(s) of sexual harassment."

nothing about whether the harassing conduct had to be *sexual in nature*. What is more, the trial court had good reason not to adopt plaintiff's proposed instructions because they called the jury's attention to the specific evidence that plaintiff wanted the jury to consider. "'[I]nstructions that highlight "'specific evidence as such'"'" are argumentative (*People v. Hughes* (2002) 27 Cal.4th 287, 361), and trial courts "must . . . refuse [] argumentative instruction[s]" (*People v. Homick* (2012) 55 Cal.4th 816, 890).

Relatedly, plaintiff finds fault with the trial court's handling of the jury's first note. The jury asked: "Regarding [question #1] on all 3 verdict forms: How do we legally define, or how are we to interpret 'because of her sex'? Is CACI 2523 . . . the sole definition we are to go by, or is there something more complete we should be looking at?" The trial court responded: "You must rely upon only the instructions we gave you." Plaintiff argues that this note evinced the jury's confusion as to whether it was appropriate to consider personnel actions as "harassing conduct"; that at least one juror admitted that this was the jury's concern during deliberations; and that the court should have responded with an instruction akin to special instruction 4. To be sure, a trial court "'is under a general obligation to "clear up any instructional confusion expressed by the jury" . . . [citation]'" (*People v. Boyce* (2014) 59 Cal.4th 672, 699 (*Boyce*)) and its failure to do is "usually reversible error" (*Sesler v. Ghumman* (1990) 219 Cal.App.3d 218, 227). But that obligation requires no further action where "the original instructions are themselves full and complete." (*Boyce*, at p. 699.) As noted above, the court's instruction was consistent with the governing law and plaintiff's proposed instruction was argumentative. The juror's affidavit is to be given no weight because "evidence of jurors' internal thought processes is inadmissible to impeach a verdict." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124; Evid. Code, § 1150, subd. (a).)

### 2. Instructions regarding surveillance and second medical opinion

FEHA permits an employer to require an employee seeking medical leave for her "own serious health condition" to obtain a certification of such by the employee's own doctor; if the employer has "reason to doubt the validity of [that] certification," the

11

employer can "require" the employee to obtain a second opinion from a doctor of the employer's choosing. (Gov. Code, § 12945.2, subds. (k)(1) & (k)(3).) An employer may also engage in "undercover surveillance of an employee" to assess whether the employee's claimed need for medical leave is genuine. (See *McDaneld v. Eastern Municipal Water Dist. Bd.* (2003) 109 Cal.App.4th 702, 707.) Because Merle Norman had requested a second medical certification and conducted surveillance of plaintiff during her medical leave, the trial court read the jury subdivision (k) of Government Code section 12945.2, and, as to surveillance, instructed: "Provided it is not done for an unlawful purpose, a company may conduct reasonable surveillance on an employee on medical leave to investigate the employer's suspicion that the employee is not truly sick. To determine whether the surveillance is reasonable, you should consider the totality of the circumstances"

Plaintiff argues that these instructions are invalid because they imply that Merle Norman's demand for a second medical exam and its surveillance of her can never constitute harassing conduct. We disagree. These instructions are silent as to whether second exam demands or surveillance can be "harassing conduct." More importantly, the jury was elsewhere instructed, without qualification, that "harassing conduct" "includes" "[h]ostile conduct or communications that convey an offensive message based upon gender." Because """"jurors are intelligent persons . . . capable of understanding and correlating all jury instructions which are given . . .,""""" we read the "instructions as a whole." (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.) Here, the totality of the instructions do not imply that these particular types of conduct can never constitute "harassing conduct"; if, like any other conduct by defendants, they "convey an offensive message based on gender," then they qualify as "harassing conduct." Plaintiff alternatively asserts that the trial court undermined her ability to prove that the second exam demand and surveillance in her case were meant to convey an offensive message by wrongly excluding evidence that the only other Merle Norman employee to have been subject to similar treatment was also one who had complained of harassment. As described below, however, this evidence was properly excluded.

12

### 3. Instructions regarding timeliness of harassment claim

A plaintiff is generally required to file a complaint with the Department of Fair Employment and Housing within one year of the "alleged unlawful practice." (Gov. Code, § 12960, subd. (d).) The trial court gave the standard CACI No. 2508 instruction regarding timeliness for both Jack and Helen. Plaintiff argues that this was error because she filed her administrative complaint within one year of the April 2010 letter Baker sent (and this letter was "undisputed[ly]" sent at the Nethercutts' direction), and that the same instruction should not have been read twice. The trial court did not err in giving these instructions. The evidence regarding the letter's impetus was disputed: The letter itself stated that it was sent on behalf of Merle Norman, but Baker testified that he sent it for Helen personally. Because a reasonable jury could have credited the letter's plain language, there was "substantial evidence" to support the instruction that plaintiff's complaint may not have been timely as to Jack or Helen because the next most recent alleged unlawful practice occurred more than one year before plaintiff filed her administrative complaint. (See *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475 (*Alamo*).) Nor was there any error in giving the instruction twice, once as to the claims against Jack and once as to the claims against Helen, because the jury had separate verdict forms for each. Lastly, there was no prejudice because the jury never found that plaintiff's claims were untimely; they rejected her claims on the merits. (*Id.* at pp. 475-476 [prejudice must be shown].)

### B. *Evidentiary errors*

Plaintiff devotes 20 pages of her opening brief to alleged errors in the trial court's evidentiary rulings, but those pages consist primarily of string citations to the trial record (more than 368, by our count), an occasional quotation from the record, and citations to two judicial decisions; there is no citation to any statute or rule of evidence and no legal argument whatsoever. This is inadequate. It is well settled that an argument on appeal is forfeited if it is not accompanied by "reasoned argument and citations to authority." (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1215; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Were this not the rule, the

13

responding party would be placed at an unfair disadvantage in trying to respond intelligently within the word limits. In this case, nearly all of plaintiff's evidentiary arguments do not even meet this minimal threshold and we deem them to be forfeited; indeed, plaintiff herself makes no effort to defend them in her reply brief. We will nevertheless address those arguments that Merle Norman responds to, or which are presented in sufficient detail that we can engage in a meaningful analysis. As with all evidentiary rulings, we review only for an abuse of discretion. (*S.M.*, *supra*, 240 Cal.App.4th at p. 559).

### 1. Baker's testimony

The trial court allowed Baker to testify regarding the reasons he wrote the April 23, 2010 letter demanding that plaintiff retract her statement that Jack and Helen had been "implicated in several sexual harassment and hostile work environment complaints"; the court reasoned that Baker's motives were "relevant to the issue of retaliation." Under the pertinent law discussed above, those reasons are also relevant to whether the letter constitutes "harassing conduct."[3] On the stand, Baker explained that he wrote the letter because he viewed plaintiff's comment that Jack and Helen had been "implicated . . . in sexual harassment and hostile work environment complaints" as a statement that there had been *findings* of such misconduct and because Helen was concerned that a false report of such findings might affect the conservatorship she had over her autistic son. During his testimony, Baker also stated (1) that plaintiff's working conditions had not been "adversely affected," (2) that plaintiff did not have a "reasonable belief" that other Merle Norman employees' complaints against Jack and Helen were true because plaintiff's belief was based on gossip, and (3) that plaintiff's evidence of harassment amounted to "a snowflake here and a snowflake here." The trial court admitted the last two statements solely for the limited purposes of showing Baker's

---

[3] The trial court also ruled that Merle Norman had never asserted the attorney-client privilege with respect to the conversation between Helen and Baker that prompted the letter. Plaintiff does not attack that ruling on appeal.

14

"thinking for reacting to [plaintiff's] letter" and "why [Baker] wrote his letter the way he did," respectively.

Plaintiff argues that Baker's testimony constituted an impermissible legal opinion. Although an expert witness may express an opinion even if "it embraces the ultimate issue to be decided by the trier of fact" (Evid. Code, § 805), an expert may not testify to legal issues reserved for the court (*Asplund v. Selected Investors in Financial Equities* (2000) 86 Cal.App.4th 26, 50; *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 884) or to issues as to which "'"the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions . . .'"'" (*PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 63). In this case, it is not clear that Baker was testifying as an expert; the trial court made no declaration of expert status and Merle Norman disclaimed any such expert status in its closing. Even if Baker were viewed as an expert, the trial court limited the admissibility of two of the three statements to his reasons for sending the letter, which are indisputably relevant. Jurors are presumed to follow such limiting instructions. (*People v. Panah* (2005) 35 Cal.4th 395, 492.) Baker's comment about plaintiff's working conditions was not so limited, but it is not "reasonably probable" than any error in admitting it would have led to a "result more favorable" to plaintiff given that the jury found against plaintiff on different elements of her harassment claim and found *for* her on her retaliation claims.

## 2. Emails between plaintiff's counsel and McGuinness

The trial court admitted the email exchange between plaintiff's counsel and McGuinness in November 2010 leading to plaintiff's termination. On appeal, plaintiff argues that it was wrong to do so because (1) the letters represented settlement negotiations subject to exclusion under Evidence Code section 1152, (2) her counsel's letters were covered by the attorney-client privilege, and (3) the court erred in allowing Merle Norman to introduce the letters during its cross-examination of plaintiff when plaintiff preferred to introduce them later when she examined McGuinness (who ultimately never testified).

15

These arguments lack merit. Although a court must exclude "[e]vidence that a person has . . . offered . . . to furnish money or any other thing . . . to another who has sustained or will sustain claims, . . . as well as any conduct or statements made in negotiation thereof . . ." (Evid. Code, § 1152), the trial court here carefully redacted any statements in the emails regarding settlement negotiations; the portions admitted into evidence contain nothing running afoul of section 1152. Like the trial court, we also conclude that plaintiff's disclosure of her emails at the hearing before the California Employment Development Department and during discovery in this case without objection waived any attorney-client privilege as to those emails. (Evid. Code, § 912, subd. (a).) The trial court provisionally admitted the emails during the cross-examination of plaintiff on the understanding that McGuinness would later testify, be subject to examination, and authenticate the emails. Although McGuiness never testified, the emails were properly admitted. Plaintiff never renewed her authentication objection when McGuinness did not testify, and her failure to do so forfeited that objection. (E.g., *People v. Chism* (2014) 58 Cal.4th 1266, 1350 (*Chism*); *People v. Holloway* (2004) 33 Cal.4th 96, 133.) Moreover, plaintiff testified that she recognized and received the emails, and this suffices to authenticate the emails. (E.g., *People v. Skiles* (2011) 51 Cal.4th 1178, 1187 ["a writing can be authenticated by circumstantial evidence and by its contents"].)

### 3. Surveillance of Michael Noland

Plaintiff proffered evidence that Michael Noland, a former Merle Norman employee, had been subject to surveillance while on medical leave following his filing of a sexual harassment complaint. The trial court noted that Noland had worked in a different department of Merle Norman than plaintiff; that Noland had been disciplined for placing a GPS device on one of the company cars; and that there was no evidence that Noland's "harassment [had] anything to do with the same people" involved in plaintiff's case. The court concluded that there was "not substantial similarity of circumstances," and excluded the evidence as "more prejudicial than probative" under Evidence Code section 352. Because the court balanced the appropriate factors under Evidence Code

16

section 352 and did so in a way that is not unreasonable, we have no basis to disturb its ruling.

### 4. Harassment of other employees

Plaintiff objects to a number of rulings excluding evidence of sexually harassing conduct by Jack or Helen against other Merle Norman employees; as we explain, the trial court's rulings were not an abuse of discretion.

Plaintiff complains that the trial court was wrong to limit Tillman's accounts of misconduct against other employees to only those accounts of which plaintiff was aware. This was correct because "if the plaintiff does not witness"—or, in some other sense, know of—"the incidents involving others, 'those incidents cannot affect . . . her perception of the hostility of the work environment'" (*Lyle*, *supra*, 38 Cal.4th at p. 285), and are consequently of less relevance.

Plaintiff next asserts that the trial court erred in not allowing Dawn Tierno-Culda, another former Merle Norman employee, to testify regarding what other people told her Helen had done. This was also correct, as such testimony would have been comprised of the out-of-court statements of the percipient witnesses or Jack's or Helen's conduct; those statements are hearsay. (See Evid. Code, § 1200.)

Plaintiff assigns error to the trial court's refusal to allow plaintiff to relay what she had heard about a 2008 incident involving Jack and former Merle Norman employee Donna Sutinore (Sutinore); according to plaintiff's proffer, Jack noticed Sutinore's braces and commented that they would prevent her from giving her husband oral sex. The trial court correctly noted that such "me too" evidence can be relevant to show Jack's or Helen's state of mind (e.g., *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 114 (*Pantoja*)), but excluded the evidence under Evidence Code section 352 due to its remoteness in time and the fact it would be coming in "secondhand" and with "no cross-examination." This ruling is squarely within the court's "broad discretion" under Evidence Code section 352. (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

Plaintiff asserts that the trial court erred in not allowing Carolyn Jacobus to testify regarding what Jack, Helen, or the chief operating officer said about what might happen

17

to plaintiff after plaintiff returned from her medical leave. However, the court sustained Merle Norman's objection on the ground that the question had been asked and answered. Plaintiff has not shown that this was incorrect.

Plaintiff lastly asserts that the trial court erred in excluding testimony regarding an alleged affair between Jack and a female Merle Norman employee. The court excluded the evidence under Evidence Code section 352, and plaintiff has not demonstrated on appeal why the trial court abused its discretion in concluding that a consensual affair involving someone not involved in this case was substantially more unfairly prejudicial than probative.

### C.    *Error in closing argument*

During closing argument, Merle Norman's counsel reviewed the special verdict forms and noted that the final question in the forms was "the lynch pin as to whether punitive damages are awarded." Counsel advised the jury that they could "not award punitive damages, because that is not in this phase," but that "there will be a phase 2 if you answer this question yes." Plaintiff argues that this constituted misconduct because it implicitly urged the jury to find no punitive damages to avoid a second phase of the trial. As proof of this, plaintiff produced an affidavit from one of the jurors saying the possibility of a second phase affected the jury's deliberations.

Merle Norman's closing argument does not require a retrial. To begin, plaintiff forfeited this argument by not making a contemporaneous objection; plaintiff asserts that her forfeiture should be excused because any objection would have been futile and/or an admonition would not have cured the harm, but the record does not support that assertion. (*People v. Whalen* (2013) 56 Cal.4th 1, 52.) Moreover, counsel did nothing wrong. The jury instructions themselves stated that "[t]he amount . . . of punitive damages will be an issue decided later" and thus contemplated a second phase; it is not error to correctly state the law. (Cf. *People v. Centeno* (2014) 60 Cal.4th 659, 666 ["'it is improper for the prosecution to misstate the law generally . . .'"].) Even if we assumed counsel's argument was somehow improper, counsel's statement was a passing comment and plaintiff, in her rebuttal, noted that any "second phase" would be "very brief" and thus

18

"should not be a factor in voting . . . ." We again give no weight to the juror's affidavit, which is inadmissible as proof of the jury's deliberations. (Evid. Code, § 1150, subd. (a).)

### D. *Uneven playing field*

Plaintiff also levels a more global attack on the trial court, asserting that she was subjected to an "uneven playing field" due to the court's inconsistent evidentiary rulings, its comments, and its differential treatment of witnesses. She also argues that the court "undermined" and "impeded" her witness examinations by allowing Merle Norman's counsel to interject objections. We are unpersuaded.

To show judicial bias, which is what plaintiff appears to be trying to do, she must show more than that the trial court ruled against her, even if it did so erroneously. (*People v. Pearson* (2013) 56 Cal.4th 393, 447; *Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786 (*Nevarez*) ["'a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review . . .'"].) Indeed, even comments and "'expressions of opinion by a trial judge'" do not constitute judicial bias if they are "based on actual observation of the witnesses and evidence in the courtroom." (*Nevarez*, at p. 786.) Nor does a court somehow act improperly in allowing an opposing party to object; that party has the statutory *duty* (and hence the right) to object (Evid. Code, § 353), and plaintiff cites no authority for the remarkable proposition that a litigant has the right to an unimpeded examination of witnesses notwithstanding her opponent's statutory rights. Plaintiff has in her briefs cited no portions of the record indicating anything beyond the trial court's conscientious efforts to rule on the many evidentiary and instructional issues presented by the parties. Plaintiff's charge of bias is without merit.

## II. Post-Trial Motions Regarding Retaliation Claims

### A. *Judgment notwithstanding the verdict*

As pertinent here, a trial court has the power to grant judgment for a defendant notwithstanding the verdict "'""when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in

every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' [Citation.]"'" (*Kowalski v. Shell Oil Co.*(1979) 23 Cal.3d 168, 175-176, quoting *McFarland v. Voorheis-Trindle Co.* (1959) 52 Cal.2d 698, 703; *Paulus v. Crane Co.* (2014) 224 Cal.App.4th 1357, 1362-1363; Code Civ. Proc., § 629.)

In its cross-appeal, Merle Norman offers three reasons why the trial court was wrong not to grant JNOV on the retaliation claims. First, it argues that the amount of time between the alleged sexual harassment (in 2008 and 2009), plaintiff's reports of sexual harassment (in mid-2009), and her email to state agencies (in April 2010) on the one hand and her termination (in late 2010) on the other hand is too great a time lapse for a jury to infer that she was terminated because of her earlier activity. Although a lack of "temporal proximity" between harassment and adverse actions is relevant to causation (*Arteaga v. Brink's Inc.* (2008) 163 Cal.App.4th 327, 353-354), "if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection" notwithstanding the passage of time (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 421). Viewing the evidence in the light most favorable to plaintiff, there is sufficient evidence to support a verdict that Merle Norman engaged in a pattern of conduct—including office moves, increased workload, and demands for retracted complaints—that is consistent with a retaliatory intent.

Second, Merle Norman points to the evidence tending to support its position that there was no casual link between sexual harassment and plaintiff's termination. However, we are obligated to disregard that evidence and look to *plaintiff's* evidence, which if credited shows that link. As a result, the trial court's observation, midway through the presentation of evidence, that plaintiff's case appeared to be "weak" is of no consequence.

Lastly, Merle Norman argues that the facts of this case are distinguishable from the facts in *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 (*Yanowitz*); this may

be true, but it is irrelevant to the question of whether plaintiff's evidence *in this case* could support a verdict for retaliation. It can.

## B.    New trial

A trial court has the power to "modif[y] or vacate[], in whole or in part" a verdict and to grant a new trial "on all or part of the issues." (Code Civ. Proc., § 657.) We review the trial court's grant of a new trial for an abuse of discretion. (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 317.)

### 1.    Plaintiff's attacks on the grant of a new trial

Plaintiff argues the trial court should not have granted Merle Norman's motion for a new trial on her retaliation-based claims; neither of the court's two reasons, plaintiff argues, justified that grant.

### a.    Motivating factor instruction

In defining the elements of retaliation under FEHA, the trial court instructed the jury, consistent with CACI No. 2505, that it had to find, among other things, that plaintiff's "reporting of sexual harassment was a *motivating reason* for [Merle Norman's] decision to discharge [plaintiff]." While plaintiff's trial was pending, our Supreme Court held that a plaintiff in FEHA retaliation cases "involv[ing] [the employer's] mixed motives" must "show that [retaliation] was a *substantial* motivating factor, rather than simply *a* motivating factor." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232 (*Harris*).) The trial court found that the conflicting evidence about Merle Norman's motives in terminating plaintiff made this a "mixed motive case," that the instruction it gave was erroneous because it did not require the jury to find that retaliation was a "*substantial* motivating factor," and that the error—by lightening plaintiff's burden— "was prejudicial to [the defendants]."

On appeal, plaintiff does not dispute that the trial court's findings that its jury instruction was in error or that such error can justify a new trial. (Accord, *Maher v. Saad* (2000) 82 Cal.App.4th 1317, 1325.) Instead, she contests the court's finding that the error was prejudicial in this case. More specifically, she argues: (1) the court's superseding cause instruction—which informed the jury that Merle Norman "could only

21

be liable to [plaintiff] if the decisions made were motivated by her sex or retaliation"—corrected any prejudicial impact by implying that retaliation had to be Merle Norman's *sole* motive; and (2) the jury, in its special verdict, answered "YES" to the question whether plaintiff was "harmed *as a result* [of] conduct [by] Merle Norman that . . . materially and adversely affected the terms and conditions of [plaintiff's] employment."

We reject both arguments. As a general matter, the failure to include the requirement of "substantiality" is prejudicial because juries will "'draw a[] meaningful distinction between "a motivating reason" and "a substantial motivating reason" . . . .'" (*Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334, 1341; *Alamo*, *supra*, 219 Cal.App.4th at p. 479; cf. generally *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1459-1460 [omitting materiality requirement from instruction may not be prejudicial when parties argued case as if such a requirement existed].) Neither of plaintiff's arguments justifies a departure from this generally applicable reasoning. We disagree that the superseding cause instruction implied that retaliation had to be Merle Norman's sole motive, because its reference to "motivat[ion]" must be read in conjunction with the instructions elsewhere that define "motivating reason" as "a reason that contributed to the decision . . . even though other reasons also may have contributed to the decision"; this does not imply a sole motive. Even if we construed the superseding cause instruction as plaintiff suggests, it would still not cure the error with the CACI No. 2505 instruction because we cannot presume that the jury ignored one instruction in favor of another. (See *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673 [noting that jurors "'are likely to be confused and misled by the conflicting statements'"].) And the jury's special verdict is of no consequence because it was a product of the incorrect instruction.

### b.      *After-acquired evidence*

During discovery, Merle Norman issued a request for documents that, among other things, required plaintiff to produce "[a]ll documents in [her] possession which relate in any way to [her] employment with" Merle Norman Cosmetics. In her response, plaintiff raised a number of objections but alternatively agreed to "produc[e] all of the

documents relating to her employment" while reserving the right to "supplement [her] response." Just "days before" Merle Norman "rested [its] case," it came to light that plaintiff had never disclosed that her personal computer still contained approximately 17,000 Merle Norman files—indeed, the entire "H:/" drive—that contained proprietary information. At that point, plaintiff cooperated by turning her personal computer over to Merle Norman's computer forensics expert. The trial court agreed to instruct the jury on the so-called "after-acquired evidence" defense—namely, that Merle Norman would not be liable if it "discover[ed], *after* an allegedly wrongful termination of employment . . . of information that would have justified a lawful termination . . . ." (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 428 (*Salas*).)[4] It also permitted Merle Norman to introduce evidence in support of that defense.

The trial court concluded that the "newly discovered evidence" regarding plaintiff's concealment of her possession of Merle Norman's proprietary documents warranted a new trial. (Code Civ. Proc., § 657 [new trial appropriate due to "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at trial"].) The court reasoned that its last-minute efforts to ameliorate the impact of the late discovery of plaintiff's concealment and of the documents themselves were insufficient; because the documents were voluminous and had been disclosed "at such a late stage" of the trial, the court reasoned, Merle Norman was left with inadequate time to analyze the documents or to integrate what it learned into its "overall defense" by raising the issue in its opening

---

**4**     We note that the trial court's after-acquired evidence instruction appears to set up an absolute defense to liability. After the trial in this case, our Supreme Court clarified that "the doctrine[] of after-acquired evidence . . . [is] not [a] complete defense[] to a worker's claims under California's FEHA"; instead, it limits the employee's recovery of damages to the period of time "from the date of wrongful discharge or refusal to hire to the date on which the employer acquired information of the employee's wrongdoing . . . ." (*Salas*, *supra*, 59 Cal.4th at pp. 414, 428-431.) We express no opinion on how the instruction should be formulated in any retrial.

23

statement or by using what it learned to cross-examine plaintiff and her witnesses throughout the trial.

Plaintiff offers four reasons why the trial court's assessment of prejudice to Merle Norman was incorrect. First, she asserts that Merle Norman already had copies of its own proprietary documents. But what matters to the after-acquired evidence defense is the fact that plaintiff possessed the documents when she should not have; whether Merle Norman also possessed them is irrelevant. Second, plaintiff argues that Merle Norman did not comply with all of its discovery obligations. That, too, is irrelevant to the question of prejudice arising from *plaintiff's* transgressions. Third, plaintiff argues that her use of a personal computer while doing work for Merle Norman did not violate Merle Norman's company policy. The evidence on this point was disputed: Although Merle Norman's then-extant "Trade Secrets Policy" prohibited employees from "disclos[ing]" or "tak[ing]" trade secret or confidential information without Merle Norman's written consent, witnesses gave different accounts of whether this prohibited the use of personal computers. Of course, no one testified that a terminated employee could retain 17,000 of Merle Norman's proprietary documents. Lastly, plaintiff argues that Merle Norman was able to introduce evidence in support of its after-acquired evidence defense and that the jury rejected it. These observations do not address the trial court's central concerns that plaintiff's concealment of her retention of the documents hamstrung Merle Norman in its efforts to present its defense or that the jury's rejection of that defense was according unreliable.

### 2. Merle Norman's attacks on the scope of the new trial

Although Merle Norman moved for a new trial solely on plaintiff's retaliation-related claims and although the instructional error warranting a new trial pertains solely to the retaliation claim, the trial court ordered a new trial on *all* of plaintiff's claims, including her claims for sexual harassment and intentional infliction of emotional distress and her request for punitive damages. The court reasoned that a trial on fewer than all of the claims would be "prejudicial to [p]laintiff" because (1) her sexual harassment claim was based on much of the "same conduct" as the retaliation claim, such that omitting the

24

former would "cause confusion" in a retrial solely on the latter, and (2) the jury's verdicts for Merle Norman on the sexual harassment and intentional infliction of emotional distress claims are difficult to square with the verdicts for plaintiff on the retaliation-based claims given the "interrelationship of the issues and the evidence," such that the jury's verdicts were "likely the result of compromise," a finding bolstered by a juror declaration so indicating.

A trial court has the power to grant a new trial "in whole or in part" (Code Civ. Proc., § 657), and thus may order a partial new trial as long as "a trial on [just the specified] issue[s] alone would not cause such uncertainty or confusion as to" "prejudice any party" by "deny[ing] [her] a fair trial." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 696.) The scope of a new trial is committed to the "sound discretion of the trial judge," and will only be disturbed when that discretion is abused. (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285.) Any doubts about the scope of a new trial "'should be resolved in favor of granting a complete new trial.'" (*Id.* at pp. 285-286, quoting *Leipart v. Honold* (1952) 39 Cal.2d 462, 466-467.)

Merle Norman argues that the trial court's order was an abuse of discretion because it exceeded the scope of Merle Norman's motion for a new trial *on the retaliation-based claims* and because the reasons the trial court offered for ordering a retrial on all counts are flawed. Merle Norman's first challenge lacks merit because courts may grant a new trial on issues "with which the [party moving for a new trial] has no quarrel." (See *Hamasaki v. Flotho* (1952) 39 Cal.2d 602, 609-611 (*Hamasaki*).) Merle Norman's challenge to the court's reasons for a complete retrial also ultimately fails. Although we agree with Merle Norman that the juror's declaration regarding the jury's deliberative thinking is not competent evidence (Evid. Code, § 1150, subd. (a)) and that the overlap of evidence between the harassment and retaliation claims is not sufficient by itself to confuse the issues, our task is to review the court's ruling, not its reasoning. (*Chism*, *supra*, 58 Cal.4th at p. 1295, fn. 12.) Here, the court did not abuse its discretion in finding that the jury's verdict reflected a compromise. A party is prejudiced by a partial new trial when the jury's verdicts reflected a compromise.

25

(*Hamasaki*, *supra*, 39 Cal.2d at pp. 606-607; *Lauren H. v. Kannappan* (2002) 96 Cal.App.4th 834, 840 (*Lauren H.*).)  Among other things, "indicators of a compromise verdict" include "a close verdict," such as a 9 to 3 verdict in a civil case.  (*Lauren H.*, at p. 841.)  As noted above, the jury in this case rejected plaintiff's sexual harassment and intentional inflection of emotional distress claims by a bare margin of 9 to 3, and the jury rejected her request for punitive damages by a vote of 10 to 2.  In light of the closeness of these verdicts, the court did not abuse its discretion in concluding that the jury's overall verdict was ostensibly a product of compromise, such that a partial new trial would be prejudicial to plaintiff.

Because the parties to a lawsuit with a compromise verdict are "allowed to adopt the jury's compromise as their own" and because a trial court must "respect their preference" (*Hamasaki*, *supra*, 39 Cal.2d at p. 609), Merle Norman should be given the opportunity to elect whether to accept the jury's compromise by withdrawing its motion for new trial or by accepting the trial court's ruling granting a new trial on *all* issues.  We remand for that limited purpose.

### 3.      Merle Norman's challenges to evidentiary rulings relevant during the new trial

Merle Norman asks us to revisit two of the trial court's evidentiary rulings that may be relevant during any retrial.  We may review these rulings to provide guidance (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1491), and our review, as noted above, is for an abuse of discretion.

#### a.      Baker's retraction letter

Merle Norman argues that the trial court erred in admitting Baker's April 2010 letter demanding that plaintiff retract her accusations of sexual harassment against Jack and Helen; according to Merle Norman, the letter is protected by the litigation privilege. The litigation privilege "applies to any communication (1) made in judicial or quasi-judicial [or authorized, official] proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of litigation; and (4) that have some connection or logical relation to the action."  (*Silberg v. Anderson* (1990) 50 Cal.3d 205,

211-212 (*Silberg*); *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*); Civ. Code, § 47 [privilege attaches to "[a] . . . publication . . . made . . . [¶] [i]n any . . . [¶] (2) judicial proceeding [or] (3) . . . any other official proceeding authorized by law"].)  Baker's letter is potentially relevant to prove Merle Norman's intent to retaliate or as an act of retaliation itself.  However, the litigation privilege does not bar admission for either purpose.

The litigation privilege does not apply at all to the first purpose.  The litigation privilege "operate[s] as [a] limitation[] upon liability" that "bars certain tort causes of action which are predicated on a judicial statement or publication itself." (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168 (*Oren Royal Oaks Venture*); *Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408, 419-420 (*Fuhrman*), overruled on other grounds in *Silberg*, *supra*, 50 Cal.3d 205; 212; *Ribas v. Clark* (1985) 38 Cal.3d 355, 364.)  It "has never been thought to bar the *evidentiary* use of every 'statement or publication' made in the course of a judicial proceeding," and thus "does not create an evidentiary privilege for such statements." (*Oren Royal Oaks Venture*, at p. 1168; *Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)  This is especially so where the statements are admitted "to prove the speaker's state of mind." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931-932.)  Thus, the litigation privilege does not apply to Baker's letter when it is admitted to prove Merle Norman's retaliatory intent.

The litigation privilege applies when Baker's letter is admitted as proof of retaliation, but is trumped by the provisions of Labor Code section 1102.5 and by FEHA's anti-retaliation provision.  Because Baker's letter followed—and was in direct response to—plaintiff's letter reporting alleged harassment to two state agencies, it constitutes "prelitigation communication" "relat[ing] to litigation that is contemplated in good faith and under serious consideration"—namely, to the official proceeding plaintiff asked the agencies to undertake. (*Action Apartment*, *supra*, 41 Cal.4th at p. 1251; *Fuhrman*, *supra*, 179 Cal.App.3d at p. 421.)  The trial court's finding that the threats of litigation in Baker's letter were merely a "negotiation tactic," while supported by

27

substantial evidence, does not alter the fact that the letter was directly responsive to—and designed to discourage—plaintiff's pursuit of the official proceedings before the state agencies.

However, courts recognize exceptions to the litigation privilege "under statutes that (1) are 'more specific' than the privilege, and (2) would be 'significantly or wholly inoperable' if the privilege applied." (*Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 339 (*Komarova*).) Plaintiff's retaliation claims are based upon Labor Code section 1102.5, which bars an "employer" from "retaliat[ing] against an employee for disclosing information . . . to a government . . . agency" (Lab. Code, § 1102.5, subd. (b)), and under FEHA, which bars an employer from "discharg[ing]" or "otherwise discriminat[ing] against any person . . . because the person . . . has filed a complaint . . ." (Gov. Code, § 12940, subd. (h)). These statutes are more specific than the litigation privilege because "the privilege is implicated in all judicial and quasi-judicial proceedings," while both statutes at issue here are "implicated in only the small subset of those proceedings that involve" retaliation by employers. (*Komarova*, at p. 339.) The Labor Code provision and FEHA's anti-retaliation provision would be "significantly inoperable" if the litigation privilege applied. That is because litigation privilege would preclude admission of any statements by an employer following the employee's lodging of a complaint with an official agency, including statements specifically aimed at retaliating at the employee for that complaint. The protections of Labor Code section 1102.5 and FEHA's anti-retaliation provision "would be nullified by the privilege"; because "[t]he Legislature presumably would not have included those [statutory] protections . . . if it intended for the privilege to apply," the privilege must yield. (*Komarova*, at p. 340.)

### b. *Reports of sexual harassment by other employees*

Merle Norman next contends that the trial court erred in allowing plaintiff to testify (1) that an unnamed Merle Norman "manager, at [her] level or higher," told plaintiff that former Merle Norman employee Carol La Porta was fired because she complained that Jack committed sexual harassment, (2) that Jack Barlup, another Merle

Norman employee, told plaintiff that "they" ordered him to retract a letter of recommendation he had written for plaintiff and that "they" were watching plaintiff's computer, and (3) that Katherine Jacobus relayed a conversation in which Helen told Jacobus that plaintiff would be replaced upon her return from medical leave. Merle Norman argues that these statements should be excluded as hearsay.

The hearsay rule bars the introduction of any out-of-court statement "that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subds. (a) & (b).) It does not preclude a party from introducing an out-of-court statement for a purpose other than its truth (e.g., *People v. Mendoza* (2007) 42 Cal.4th 686, 697), such as showing that the testifying witness heard the out-of-court statement. In sexual harassment cases, evidence of sexual harassment against other employees can be relevant to show the offender's motive (that is, gender bias) (*Pantoja*, *supra*, 198 Cal.App.4th at p. 114) or to show that the plaintiff-victim perceived her working environment to be hostile (*Lyle*, *supra*, 38 Cal.4th at p. 284; *Yanowitz*, *supra*, 36 Cal.4th at p. 1043 [subjective good faith of plaintiff-victim's perception of harassment is also relevant to whether she may bring a retaliation claim]). Whether or not the unnamed manager, Jack Barlup, or Carol Jacobus were telling the truth, the fact that plaintiff heard their statements was relevant to show her subjective perception of the working environment; because those statements are consequently admissible irrespective of their truth, the hearsay rule is not a bar. To be sure, they violate the hearsay rule to the extent they are admitted as proof of those incidents. But the trial court on retrial can weigh the permissible and impermissible uses under Evidence Code section 352 and, if it elects to admit them again, give the jury a limiting instruction. What matters for purposes of providing guidance is that they are not *categorically* inadmissible.[5]

_____

[5]      In light of this conclusion, we have no reason to reach Merle Norman's further contention that only certain employees may give "authorized admissions" within the meaning of the hearsay rule's exception for such. (See Evid. Code, § 1222.)

## III. Sanctions Order

A trial court may assess monetary sanctions against a party for willfully "[f]ailing to respond . . . to an authorized method of discovery." (Code Civ. Proc., §§ 2023.010, subd. (d), 2031.300, subd. (c), 2031.310, subds. (a) & (h); *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545 (*Vallbona*).) The trial court in this case awarded Merle Norman $40,113 in monetary sanctions because plaintiff "willful[ly]" failed to comply with Merle Norman's request for all documents "relating to her employment with" Merle Norman by not disclosing the 17,000 Merle Norman documents she possessed. We review this award of sanctions for an abuse of discretion. (*Vallbona*, at p. 1545.)

Plaintiff raises four categories of challenges to this sanctions order. First, she argues that Merle Norman never moved to compel her further responses, and that this omission dooms its request for sanctions. Although a motion to compel is generally a procedural prerequisite to a sanctions order, a motion is not required where the opposing party purports to comply with the discovery request; in such cases, there is ostensibly no reason to move to compel, and no motion is required. (See *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1428; *Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447, 1456 ["It is only when responses are deemed inadequate or evasive that a motion to compel is required"].) The trial court invoked this exception here, noting that "it appeared from [plaintiff's] response that the plaintiff was not withholding document production . . . ." Plaintiff provides no basis to assail this finding.

Second, plaintiff raises a few procedural challenges. She argues that the trial court wrongfully denied her an evidentiary hearing on the motion because the court initially scheduled an evidentiary hearing but later canceled it. But there is no right to an evidentiary hearing on a sanctions motion; she is entitled to notice and an opportunity to be heard, and that is what she got. (See *Seykora v. Superior Court* (1991) 232 Cal.App.3d 1075, 1081-1082.) Plaintiff also argues that the court erred in considering Baker's affidavit requesting an additional $39,100 in his attorney's fees and costs because the affidavit was not filed until after the hearing at which the sanctions motion

30

was argued. However, plaintiff received Baker's request and filed a written response. That is enough.

Third, plaintiff argues the Merle Norman did not comply with its discovery obligations. But Merle Norman's noncompliance, if any, is not a defense to *her* noncompliance.

Fourth, plaintiff contends that the monetary sanction was excessive because plaintiff never tried to use the documents she withheld at trial, because the trial court already permitted Merle Norman to raise an after-acquired evidence defense at trial, and because the trial court's grant of a new trial partially on the basis of her discovery misconduct effectively amounted to a $1,055,236 sanction. These arguments are without merit. As explained above, whether plaintiff tried to use the documents at trial is not relevant to whether she complied with her discovery obligations or whether defendants incurred additional attorney's fees and costs in having to respond to the midtrial revelation of her discovery misconduct. Similarly, Merle Norman's ability to raise an after-acquired evidence defense is also not germane to the issue of sanctions, particularly in light of the court's conclusion that Merle Norman's ability to present that defense was compromised by plaintiff's late disclosure. Lastly, the court's grant of a new trial was not based solely on plaintiff's discovery misconduct, and was in any event designed as a means of addressing the prejudice to Merle Norman—not as a means of sanctioning plaintiff.

## DISPOSITION

We affirm the judgment, but remand the matter to the trial court so that Merle Norman may elect whether to withdraw its motion for new trial. Parties to bear their own costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:

_____, P.J.
BOREN


_____, J.
CHAVEZ